IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA, :
:
        Plaintiff, :
:
    v. : Criminal Action No. 08-42-JJF
:
NELSON A. ADIBE, :
:
        Defendant. :

Christopher J. Burke, Esquire, Assistant United States Attorney, of the OFFICE OF THE UNITED STATES ATTORNEY, Wilmington, Delaware.

Attorney for Plaintiff.

Charles E. Butler, Esquire, Wilmington, Delaware.

Attorney for Defendant.

**MEMORANDUM OPINION**

March 31, 2010
Wilmington, Delaware

*Joseph J. Farnan Jr.*
Farnan, District Judge.

## I. Background

On March 13, 2008, Defendant Nelson A. Adibe ("Defendant") was indicted and charged with three counts of bank fraud, in violation of 18 U.S.C. §§ 1344 & 2 (Counts One, Two and Three), one count of aggravated identity theft, in violation of 18 U.S.C. § 1028A (Count Four), one count of misuse of a Social Security number, in violation of 42 U.S.C. § 408(a)(7)(B) (Count Five), and one count of identity theft, in violation of 18 U.S.C. § 1028(a)(7) (Count Six). (D.I. 13.) Specifically, Count Four charges that Defendant knowingly used, without lawful authority, a means of identification (i.e., the name, date of birth, and Social Security number) of another person (i.e., victim P.H.) during and in relation to the crime of bank fraud. (Id. ¶ 12.) Count Six charges that Defendant knowingly used in or affecting interstate or foreign commerce, without lawful authority, a means of identification (i.e., the name, date of birth, and Social Security number) of another person (i.e., victim P.H.) with the intent to commit bank fraud.[1] (Id. ¶ 14.) Defendant pled guilty to Counts One, Two, Three and Five. (D.I. 44, Tr. at 23-24.)

Defendant knowingly and intelligently waived his right to a trial by jury on Counts Four and Six (Tr. at 24-25), and the

---

[1] Defendant stipulated to the fact that P.H. is a real person, and that the name, date of birth, and Social Security number are a true and correct means of identification of P.H. (D.I. 43, GX 109.)

government consented to a bench trial pursuant to Rule 23(a) of the Federal Rules of Criminal Procedure (D.I. 36). A one day bench trial was conducted, and for the reasons to be discussed, the Defendant will be adjudged guilty of both counts.

## II. Findings of Fact

Based on the evidence of record,[2] the Court finds as follows:

1. Defendant is a native of Nigeria who first emigrated to the United States in 1996. (Tr. at 248.) He returned to Nigeria around December 2003 or January 2004, and subsequently came back to the United States in October 2005. (Tr. at 252-53.) Defendant testified that he was first introduced to O.A. through a mutual friend in 2002, when Defendant was living in Maryland. (Tr. at 265-66.)

2. When Defendant returned to the United States in 2005, he reconnected with O.A. (Tr. at 273.) Defendant testified that O.A. came to visit New York, where Defendant was then living, and that O.A. began to tell Defendant how to "go to the bank and open an account" and "start making money." (Tr. at 274.) Defendant went with O.A. to get his passport photo taken, which O.A. then used to make false identifications. (Tr. at 275.)

---

[2] The Court took judicial notice of facts admitted by Defendant as part of his plea to Counts One, Two, Three, and Five. (Tr. at 29-30.)

3. When a customer opens a checking or savings account at Citizen's Bank, Citizen's Bank requires the customer to provide a form of identification. (Tr. at 108-09.) Standard procedure is for the bank representative to enter the customer's name, address, telephone number, date of birth, mother's maiden name, place of employment, and social security number. (Tr. at 110.) The representative then runs two computer checks on that information, through systems called Equifax and Check Systems. (*Id.*) Using the customer's name, address and social security number, Equifax runs a credit check. (Tr. at 111.) If the customer has a good credit score, he will be pre-approved for overdraft protection and a credit card account. (Tr. at 111-12.) If the customer chooses to accept these services, he must sign for them. (Tr. at 112.) Using the customer's name and social security number, Check Systems determines if the customer owes money to another bank. (Tr. at 114.)

4. Customer service representatives for Citizen's Bank do not directly inform customers that they will be conducting Equifax and Check Systems computer checks. (Tr. at 117.) Each representative has a sign in his or her work area which states: "For your protection all new account applications are verified by Equifax Financial Services. All new accounts are verified though Check Systems." (Tr. at 118.)

3

5. Under policies in place at Citizen's Bank in 2006-2007, if the Equifax check indicated that a customer's name, address, and/or social security number did not match Equifax records, the bank representative was supposed to request additional verification of the person's identity. (Tr. at 115.) Such verification could include a utility bill, a lease, or an insurance card. (Id.) Once the bank representative felt comfortable with the verification, a supervisor's approval was required to continue with opening the account. (Id.)

6. Citizen's Bank records indicate that the B.T. account was opened on December 5, 2006. (GX 3.) The records further indicate that an Equifax credit check was run, and that there was a system-generated warning to only open the account after obtaining additional forms of identification. (Id.) In addition, the records indicate that the bank representative opening the account entered the following comments: "reviewed customers leasing agreement with current address and home phone line exp 2/02/2007, had employee id card with address [sic], exp date and photo 06/12/2010." (Id.) Defendant denies that he supplied any additional documents to the bank representative when opening the B.T. account. (Tr. at 320.) The bank representative responsible for opening the B.T. account did not testify.

7. On February 14, 2007, inspectors from the United States

    Postal Inspection Service executed a search warrant of Defendant's residence, and arrested Defendant pursuant to an arrest warrant. (Tr. at 183-84.) During the course of the search, inspectors recovered a Toyota briefcase from under Defendant's bed. (Tr. at 200.) Defendant testified that on February 13, 2007, the day before the warrant was executed, O.A. dropped off the Toyota briefcase at Defendant's apartment with the explanation that the briefcase contained "important documents," and that Defendant put the briefcase in his hall closet. (Tr. at 289-90.) Defendant's wife gave a similar account in her testimony. (Tr. at 241-42.) Defendant further testified that, when police knocked on his door to execute the warrant, Defendant opened the briefcase for the first time, saw documents in it, and proceeded to put it under his bed. (Tr. at 291.)

8. The Toyota briefcase contained a folder with vehicle purchase reports from Toyota of Glen Burnie which detailed identifying information of some of the dealership's customers. (Tr. at 201; GX 97A.) This information included the customers' names, addresses, phone numbers, dates of birth, and Social Security numbers. (Id.) One of the reports contained the identifying information of P.H. (Tr. at 202-03; GX 97A.) The briefcase also contained two pieces of mail addressed to Defendant and his wife (GX 97C), as

      well as a FedEx envelope, containing an auto parts invoice, addressed to O.A. (GX 97B). (Tr. at 205-206.) Defendant's wife testified that she did not put the mail addressed to Defendant and herself in the briefcase. (Tr. at 246.)

9. Former Postal Inspector Khary Freeland (now a Special Agent with the Department of Homeland Security) ("Agent Freeland"), who testified at trial, was not present in the apartment when the briefcase was recovered. (Tr. at 215.) Agent Freeland testified that when postal inspectors seize items during a search, they tag the items with a "715" evidence ticket, listing the location and address from which the item was seized. (Tr. at 185.) Agent Freeland testified that the items in the briefcase were marked with an evidence ticket stating: "[Defendant's home address], master bedroom, under bed in Toyota briefcase." (Tr. at 200). The ticket was prepared by Agent Freeland's supervisor. (Tr. at 221.) Individual items were not inventoried at the time the contents of the briefcase were seized. (Tr. at 220.) Agent Freeland later prepared the evidence tickets for Government Exhibits 97A, 97B, and 97C at his office. (Tr. at 220.) The briefcase itself was not seized, to the best of Agent Freeland's knowledge. (Tr. at 218.)

10. Besides the Toyota briefcase, inspectors recovered other

items, including a checkbook in the name of J.G. (GX 99.) Agent Freeland testified that the checkbook, containing a carbon copy of a check with K.F.'s name written on it, was found in Defendant's hall closet. (Tr. at 188-89.) On direct examination, Defendant stated that he located the checkbook and two other false identifications in the Toyota briefcase and mailed them to the Government on his own initiative. (Tr. at 263-64.) When asked on cross-examination how he could have mailed the checkbook in May 2008 if Agent Freeland had referred to the same checkbook during a grand jury session in March 2008, Defendant had no explanation. (Tr. at 298-99.) A confusing interaction followed with the prosecutor, in which Defendant did not clearly articulate whether he contended that he mailed the checkbook itself, or just the check with K.F.'s name on it. (See Tr. at 299-301.)

11. On May 19, 2007, Defendant opened an account in P.H.'s name at Citizen's Bank using identifying information of P.H., and a counterfeit drivers' license in P.H.'s name. (D.I. 13 ¶ 9.) Citizen's Bank records indicate that after running an Equifax credit check, a system-generated warning told the bank representative to "[o]nly open account(s) after obtaining two additional forms of ID that include an address and telephone number- one of which must contain a

7

photograph." (GX 4.) Defendant accepted overdraft protection and opened a credit card account. (See id.) When Defendant opened the credit card account, he signed a credit form. (GX 71.) Among other things, the form stated in bold letters "[t]his 'prescreened' offer of credit is based on information in your credit report indicating that you meet credit criteria." (Id.)

12. Defendant has opened and used several credit card accounts in his own name. (Tr. at 311-12.)

13. On July 13, 2007, Defendant provided a Citizen's Bank representative with identification falsely identifying himself as P.H., and withdrew $3900 from the savings account he had previously opened in P.H.'s name. (D.I. 13 ¶ 10.)

14. Marie Sweeney, an assistant branch manager at Citizen's Bank, testified that on July 19, 2007, she assisted Defendant when he opened an account in K.F.'s name, (Tr. at 120-21.) Upon opening the account, Defendant executed a Personal Signature Card in K.F.'s name. (GX 79.) Ms. Sweeney testified that every time she presents a Signature Card to a customer, she informs the customer that he/she has to verify that it is the customer's correct Social Security number, and that he/she is the authorized signer on the account. (Tr. at 145.) Defendant denies being told this when executing the Signature Card for the K.F. account.

8

(Tr. at 316.)

15. Besides the P.H. account, Defendant admits to fraudulently opening accounts in the names of K.F., J.V., K.H., and B.T.[3] (Tr. at 302.)

16. Defendant admitted that he presented false identifications to open each account, and testified that each time, the false identification was supplied by O.A. (Id.) Defendant testified that O.A. always drove him to a bank and provided him with the false identification and other identifying information that Defendant then used to open an account. (Tr. at 276-77.) Defendant maintains that he did not know where O.A. got the information. (Tr. at 277.) Defendant testified that at the time he presented the identifications, he did not know they belonged to real people. (Tr. at 282.) However, he admits that he was pretending to be someone other than himself when opening the accounts. (Tr. at 305.) Defendant further testified that O.A. supplied him with the checks to deposit in the accounts, as well as the withdrawal slips which Defendant used to withdraw money from the accounts. (Tr. at 278-79.) Once he opened the accounts and made deposits or withdrawals, Defendant testified that he

---

[3] Defendant stipulated that K.F., J.V., K.H., and B.T. are real people, and that their names, dates of birth, and Social Security numbers are true and correct means of identification. (GX 109.)

9

turned over any information from the bank, the cash, and the false identification to O.A. (Tr. at 280.)

### III. Conclusions of Law

17. For Defendant to be found guilty of Count Four, aggravated identity theft, the Government must prove beyond a reasonable doubt that Defendant, "during and in relation to any [enumerated predicate felony violation], knowingly transfer[red], possesse[d], or use[d], without lawful authority, a means of identification of another person." 18 U.S.C. § 1028A(a)1).

18. "[Section] 1028A(a)(1) requires the Government to show that the defendant knew that the means of identification at issue belonged to another person." U.S. v. Flores-Figueroa, 129 S. Ct. 1886, 1894 (2009).

19. For Defendant to be found guilty of Count Six, identity theft, the Government must prove beyond a reasonable doubt that Defendant "knowingly transfer[red], possesse[d], or use[d], without lawful authority, a means of identification of another person with the intent to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a violation of Federal law, or that constitutes a felony under any applicable State or local law," 18 U.S.C. § 1028(a)(7), and that the transfer, possession, or use of the means of identification was in or affected

interstate commerce. 18 U.S.C. § 1028(c)(3)(A); see also U.S. v. Agerwal, 314 Fed. Appx. 473, 475 (3d Cir. 2008).

20. By tendering guilty pleas to Counts One, Two, Three, and Five, Defendant admitted to all elements of Counts Four and Six except knowledge that the means of identification belonged to another person. Accordingly, the Court finds, and the parties agree (D.I. 46, at 2; D.I. 47, at 1), that the only disputed issue with respect to Counts Four and Six is whether Defendant knew that the means of identification used actually belonged to a real person.

21. In U.S. v. Flores-Figueroa, the Supreme Court recognized the potential practical difficulty of proving beyond a reasonable doubt that a defendant knew that the means of identification at issue belonged to another person. Flores-Figueroa, 129 S. Ct at 1893. For example, an alien who unlawfully entered the United States might give his employer identification documents without knowing, or caring, whether those documents in fact belong to someone else. Id. However, the Supreme Court noted that "in the classic case of identity theft, intent is generally not difficult to prove." Id. "[T]he examples of identity theft in the legislative history (dumpster diving, computer hacking, and the like) are all examples of the types of identity theft where intent should be relatively easy to prove." Id.

22. The Court finds that at numerous points during his testimony, Defendant's version of certain events was in direct conflict with the version of those events presented by otherwise credible witness testimony and evidence. See supra ¶¶ 6, 8-9, 10, 14. Accordingly, the Court accords diminished credence to Defendant's testimony.

23. The Court concludes that Defendant knew, beyond a reasonable doubt, that P.H.'s name, address, Social Security number, and other identifying information belonged to a real person when Defendant opened an account in P.H.'s name on May 19, 2007. Defendant signed a credit card agreement which specifically stated, in bold, that the offer was based on credit criteria. More importantly, Defendant acknowledged that he has open credit card accounts in his own name. The obvious inference is that Defendant, by using his own credit cards, was aware that credit cards must belong to real people who will pay their bills. The notion that Defendant has credit cards in his own name, yet somehow believed that he could open a credit card in P.H's name if P.H. were not a real person, is not reasonable or logical.

24. The Court further concludes that the opening of the account in B.T.'s name in December 2006 provides circumstantial evidence that Defendant knew that P.H.'s name, Social Security number, and other identifying information belonged

to a real person when he opened accounts in P.H.'s name. Although Defendant contends that he was never asked to provide additional verification of his identity as B.T., his contention is contradicted by Citizen's Bank records which were admitted into evidence without objection by Defendant. The records indicate that Defendant presented the bank representative with a lease agreement and employee identification card in the name of B.T. Defendant argues the verification is "all but certainly false," (D.I.47, at 5), but the Court finds nothing in the record to support this argument. In the Court's view, this evidence indicates that months prior to opening the P.H. account, Defendant was aware that Citizen's Bank would attempt to verify that he was the actual person he represented himself to be when opening an account. Moreover, Defendant should have been aware that the type of documents he presented, particularly the lease agreement, generally only exist in reference to real people.

IV. **Conclusion**

Based on the findings of fact and conclusions of law recited above, the Court concludes that the Government has proven, beyond a reasonable doubt, the Defendant knew that the means of identification actually belonged to another person. Accordingly, Defendant is adjudged guilty of Counts Four and Six of the

Indictment.

An appropriate Order will be entered.